**BECKMAN INSTRUMENTS, INC.,**
**Plaintiff-Appellant**
**(Cross-Appellee),**

v.

**TECHNICAL DEVELOPMENT CORPORATION and Franklin F. Offner, Defendants-Appellees (Cross-Appellants).**

**Nos. 17835, 17836.**

United States Court of Appeals,
Seventh Circuit.

Sept. 4, 1970.

Rehearing Denied Oct. 13, 1970.

---

M. Hudson Rathburn, Sheldon Karon, Chicago, Ill., for Beckman Instruments.

Myron Lieberman, Edward A. Haight, Chicago, Ill., for Technical Development.

Before SWYGERT, Chief Judge, and CUMMINGS and PELL, Circuit Judges.

SWYGERT, Chief Judge.

This appeal presents important issues concerning the doctrines of patent misuse and licensee estoppel. A statement of the facts is necessary before further elaboration and examination of these issues.

Technical Development Corporation is the exclusive licensee of certain patent rights owned by Franklin F. Offner. On August 8, 1961 Technical entered into a "package" sublicense agreement with Beckman Instruments, Inc. The agreement grants Beckman an exclusive sublicense, covering at its inception twenty-one patents and applications and, in addition, certain applications filed by Offner after August 8, 1961 and the patents issued thereon.

The agreement provides that the payment of royalties by Beckman is to be measured by varying percentages of the gross sales price of "Apparatus Subject to Royalties" manufactured by Beckman. Five categories of apparatus are listed. The first four relate to specific types of biochemical electronic apparatus. The fifth includes all apparatus other than those described in the first four categories which are covered by any patent or application sublicensed under the agreement. A ceiling of five million dollars in royalties is stipulated. When payments to Technical reach this ceiling the sublicense becomes fully paid and irrevocable. Unless sooner terminated, the agreement extends to the date when the last sublicensed patent expires. Prior termination of a sublicense of any patent covered by the agreement is permitted if Beckman does not make use of the patent and advises Technical in writing that it has no wish to use such patent or engage in such field of use in the future.

In December 1965 Patent No. 3,225,-305 was issued on an application filed by Offner in January 1962 covering an alleged invention of a transistorized differential amplifier. By the terms of the licensing agreement the '305 patent became sublicensed to Beckman. Beckman refused, however, to pay royalties on the apparatus covered by the patent. The refusal precipitated a demand by Technical for arbitration under the terms of the agreement. Beckman thereupon filed its complaint in the instant case, challenging the validity of the '305 patent and the legality of the sublicensing agreement.

The district court granted summary judgment for defendants on Beckman's claim challenging the validity of the '305 patent. The court relied solely upon the doctrine of licensee estoppel. In addition, the district court dismissed Beckman's claim that the sublicense agreement was illegal, holding that the charges of patent misuse failed to state a claim upon which relief could be granted or failed to state an actual controversy. The district court also vacated its prior order staying all judicial proceedings pending completion of arbitration and entered an order restraining arbitration during the pendency of this appeal. Beckman appeals from the summary judgment with respect to the '305 patent and the dismissal of its claim challenging the legality of the licensing agreement. Defendants cross-appeal from the district court's refusal to stay this proceeding pending arbitration.

We reverse the summary judgment and affirm the refusal to stay this proceeding pending arbitration. The dismissal of plaintiff's challenge to the legality of the sublicense agreement is reversed in part and affirmed in part.

I

In Count I of the complaint, Beckman seeks a declaration of invalidity, non-

infringement, and unenforceability with respect to the '305 patent. The plaintiff alleges fraud in the procurement of the patent and also noncompliance with sections 102, 103, and 105, Title 35 of the United States Code.

The district court, relying on the licensee estoppel doctrine, granted defendants' motion for summary judgment. Two months later the Supreme Court overruled this doctrine in Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). Relying on the supremacy of federal patent policy over state contract law, the Court held that the public interest in encouraging challenges to invalid patents requires that licensees be allowed to challenge patent validity and escape payment of royalties. The link between the need for challenge and the remedy of abolishing licensee estoppel was provided by the Court's holding that: "Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification." 395 U.S. at 670, 89 S.Ct. at 1911.

Defendants attempt to avoid the impact of the Lear decision by arguing that the rule announced in that case should be limited to nonexclusive licenses and that the doctrine of licensee estoppel should still apply to exclusive licensees such as Beckman. It is true that the license involved in Lear became nonexclusive prior to the filing of suit, see Adkins v. Lear, Inc., Cal.App., 52 Cal.Rptr. 795, 806 (1966), but nowhere in the Supreme Court's opinion is this fact mentioned. Defendants suggest that this was mere oversight on the part of the Court, and that in fact the basic rationale of Lear is inapplicable to exclusive licensees because outsiders also have a strong economic incentive to challenge the monopoly granted the exclusive licensee. In the case of nonexclusive licenses, defendants argue, all would-be competitors are free to become licensees, and henceforth would be barred from challenging the patent unless a limited exception to the doctrine of licensee estoppel were made.

■ We reject the argument. Even if the failure to distinguish between exclusive and nonexclusive licenses was oversight, we are not convinced that the Supreme Court would rule differently on the facts of this case. Nor can we say that the distinction which the defendants suggest is so great as to require a limitation on the Lear rule, especially in light of the "strong federal policy favoring free competition in ideas which do not merit patent protection." Lear, Inc. v. Adkins, supra, 395 U.S. at 656, 89 S.Ct. at 1904.

Defendants also argue that an exclusive licensee enjoys a monopoly unavailable to a nonexclusive licensee and, having gotten his bargain, should not be allowed to escape royalty payments, especially when the patentee is prevented from licensing to others. But, as plaintiff correctly points out, the whole purpose of this suit is to show that Offner in fact invented nothing and that plaintiff was paying for the use of unpatentable ideas. Moreover, substantially similar arguments as the defendants make were rejected by the Court in Lear. There the Court said:

Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. * * * We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest. 395 U.S. at 670, 89 S.Ct. at 1911.

■ Defendants' next contention is that the doctrine of estoppel by marking was not necessarily overruled or disapproved by the Lear case. Plaintiff concedes that, at Offner's request, it placed the number of the '305 patent on certain of its products during most of the year 1966. Although the district court declined to rule on this point, basing its

grant of summary judgment entirely upon the doctrine of licensee estoppel, we hold as a matter of law that licensees are no longer estopped to challenge the validity of a licensed patent merely because they have marked their products with the patent number.

Defendants attempt to distinguish the doctrines of licensee estoppel and estoppel by marking by suggesting that the former is based on principles of contract law, while the latter has its basis in equity. But defendants' arguments in support of each of these doctrines sound very similar, namely, that it is unfair for licensees to use the patent and accept the benefits of the license and then attack the validity of the patent. However, the Supreme Court in *Lear* rejected such arguments when applied to the licensee estoppel doctrine, and we think the Court's reasoning extends to the doctrine of estoppel by marking as well. Defendants have not suggested any reason why the "strong federal policy" in favor of encouraging challenges to invalid patents should not apply when there has been marking with the patent number. Perhaps it is true that such marking provides the licensee with additional protection from competitors, thus making it seem all the more unfair to allow him to repudiate his obligations. However, it must be noted that the Supreme Court in *Lear* conceded that patent invalidity does not amount to total failure of consideration, but nonetheless held that patent invalidity must be made a complete defense to the obligation to pay royalties. We cannot say that the additional consideration or "benefit" flowing to the licensee who marks his products with the patent number is sufficient to make the *Lear* case and its policy rationale inapplicable.

## II

Count II of the amended complaint charges defendants with five separate forms of patent misuse through various provisions of the sublicensing agreement: first, requiring payment of royalties based on plaintiff's gross sales, including the sale of apparatus not covered by any sublicensed patents; second, requiring that royalties continue until the expiration of the last sublicensed patent; third, preventing Beckman from terminating its obligation under the agreement except by paying royalties aggregating five million dollars or abandoning the fields of biochemical electronics to which it obtained entry through the licensing agreement; fourth, extending coverage, and hence the duration of the agreement, to patents conceived by Offner before the date of the agreement but applied for thereafter; and fifth, fraudulently procuring the '305 patent.

### A. *Royalties based on gross sales*

Under the licensing agreement Beckman is obligated to pay royalties on its products if they fall within any of the five categories listed in the agreement under "Apparatus Subject to Royalties." Conceivably, of course, this provision for royalties based on gross sales may cover products which utilize none of the licensed patents. The district court was of the view that such an arrangement, if voluntarily agreed to, was permissible, citing Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), and therefore concluded that plaintiffs had failed, in this particular, to charge actionable misuse of the licensed patents.

In *Automatic Radio*, a licensing agreement, covering in excess of 570 patents, provided for royalties based on a percentage of the licensee's selling price of its product regardless of whether any of the patents was used. The Supreme Court said that although convenience may not justify the extension of a patent monopoly, no "inherent" extension was effected under a provision which measures royalty payments by a percentage of the licensee's sales of unpatented as well as patented products. "Sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the li-

censing agreement." 339 U.S. at 834, 70 S.Ct. at 898. The Court held that a royalty agreement of this nature was not a per se misuse of the patents.

After the district court's dismissal in the case at bar, the Supreme Court decided Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). In *Zenith* the district court had enjoined the patent owner from "conditioning" the grant of a license "upon the paying of royalties on the manufacture, use or sale of apparatus not covered by such patent." The Supreme Court held that such conditioning amounted to patent misuse and that a patent's "leverage" cannot be used "to garner as royalties a percentage share of the licensee's receipts from sales of other products." The Court indicated that *Automatic Radio* was not contrary to this holding and that that decision "is not authority for the proposition that patentees have *carte blanche* authority to condition the grant of patent licenses upon the payment of royalties on unpatented articles." The Court went on to say that, "[i]f convenience of the parties rather than patent power dictates the total-sales royalty provision, there are no misuse of the patents and no forbidden conditions attached to the license."

■ The defendants contend that absent an allegation that they coerced the plaintiff into agreeing to the royalty provision, there is no showing of misuse. It is true that the complaint does not charge coercion. On the other hand, it does charge patent misuse by requiring royalties "on apparatus sold by plaintiff regardless of whether such apparatus is covered by any sublicensed patent rights." Notwithstanding the absence of a direct charge of coercion, we believe that the question whether the agreement was one of mutual convenience or was "conditioned" by the patentee should not depend on formalities of pleading. Whether or not Technical was guilty of patent misuse is an issue of fact to be determined at trial. All that is required at this stage is that the defendants have

fair notice of the claim asserted. We think that the allegations of the complaint fulfill that requirement. In Glen Mfg. Inc. v. Perfect Fit Industries, Inc., 420 F.2d 319 (2d Cir. 1970), patent misuse was charged with respect to a total-sales royalty provision in a licensing agreement. The district court held that the contract amounted to patent misuse, rejecting an application of *Automatic Radio* on the ground that such a royalty device "is an exception to the general rule requiring a strict, limited royalty structure." Subsequent to the district court's decision and before the case reached the court of appeals, the Supreme Court decided *Zenith*. After discussing the holding in *Zenith*, the Second Circuit remanded the case to the district court for further findings on the issue of "conditioning" and for a determination of whether the license agreement amounted to patent misuse under *Zenith*. No concern was evidenced that the case had been tried on issues not framed under *Zenith*. For a stronger reason—because this case has not even been tried—we think that a similar approach is dictated here.

### B. *Royalties until the last patent expires*

The licensing agreement provides that it shall extend to "the date of expiration of the last to expire of the United States Letters Patent included in Licensed Patent Rights." In Count II of its complaint, the plaintiff charges that this provision constitutes patent misuse by extending its royalty obligation for an indefinite and unreasonable period of time and beyond the expiration date of patents which may cover some of the apparatus manufactured by plaintiffs.

■ The district court ruled that this provision did not constitute patent misuse, citing in particular McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381 (10th Cir. 1965), where the court said at page 409:

The question thus presented is whether a license agreement covering a

package of patents, voluntarily entered into by the parties, is unlawful by reason of the fact that the royalties payable thereunder are based upon the licensee's overall operations and upon a package of patents, some of which have expired or will expire during the effective period of the agreement. The validity of such an agreement was upheld by the Supreme Court in Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312.

We are in agreement with the Tenth Circuit that a package license agreement, voluntarily entered into, which requires the payment of royalties beyond the expiration of some, but not all, of the licensed patents is valid. However, the question remains whether the licensing agreement in the case before us was voluntarily entered into or was "conditioned" in a manner proscribed by *Zenith*. We perceive no significant distinction between the payment of royalties on apparatus which were never patented and payment of royalties on apparatus on which the licensed patents have expired. When improper conditioning is proved, both arrangements are unjustified attempts to expand the scope of the patent monopoly to cover ideas in the public domain. We do not think that the absence of a charge that this provision was coerced by the defendants is fatal to the claim that the provision constitutes patent misuse. For the reasons heretofore developed in respect to the sufficiency of the allegations concerning the provision for royalties based on gross sales, the plaintiff should be given the opportunity to prove at trial that the provision in question was a condition insisted upon by Technical.

■ Count II of the complaint also charges that it was a misuse of the licensed patents to include provisions in the agreement which "empower defendants to extend the term of the sublicense agreement and plaintiff's obligations to pay royalties on unpatented products,

without plaintiff's consent, by procuring United States Patents on Offner's unfiled inventions at any time subsequent to August 8, 1961, the date of the sublicense agreement." We are unable to see how this provision by itself could constitute patent misuse, even if improper conditioning were shown. As we understand it, there are two elements in a claim of patent misuse under *Zenith*, namely, conditioning and improper extension of the patent monopoly to cover unpatented products. We agree with plaintiff that the inclusion of subsequently filed patents in the license has a tendency to extend the term of the license, and therefore aggravates the other alleged forms of patent misuse involved, *i.e.*, the gross sales royalty and last-patent-to-expire provisions. But, standing alone, it is not an improper extension of the patent monopoly to require royalties based on patents filed for after the license is entered into. We therefore affirm the dismissal as to this claim.

#### C. Other patent misuse allegations

The plaintiff in Count II of its complaint makes the additional charge of patent misuse by referring to those provisions of the agreement which do not permit the plaintiff to terminate "its obligation to pay royalties on unpatented products except by paying to defendant Technical Development Corporation royalties aggregating five million dollars ($5,000,000) or by fully and permanently abandoning the field of biochemical electronics to which plaintiff obtained entree through the sublicense agreement."

■ Plaintiff argues that these termination provisions are "unreasonably oppressive and anticompetitive." The argument assumes an interpretation of the contract which is unjustified. The five million dollar requirement is merely a ceiling on the amount of royalties that the plaintiff is required to pay if it con-

tinues to manufacture and sell apparatus which use some, but not all, of the sublicensed patents, and even though some of the apparatus does not employ any of the patents. The agreement does not require the payment of a minimum royalty. If no apparatus which is subject to royalties are sold, no royalties are to be paid under the agreement. We are of the view that the five million dollar royalty ceiling provision is entirely independent of the provision which relieves the plaintiff of royalties if, according to terms of the agreement, plaintiff "does not make use of any sublicense granted hereunder * * * and if Beckman further declares in writing * * * that it has no wish in the future to use such patent or claim or to engage in such field. * * *"

■ Although we are not prepared to stamp with legality that part of the agreement which requires the plaintiff to abandon fields of biochemical apparatus in which it is engaged unless it pays royalties on apparatus regardless of whether it uses the licensed patents, we believe that the district court was correct in dismissing this claim of misuse on the ground that the issue is "hypothetical" and does not present an actual controversy. The court reasoned that the issue is hypothetical unless the plaintiff at least alleges a definite intent to terminate its royalty obligation. We agree. Wembley, Inc. v. Superba Cravats, Inc., 315 F.2d 87 (2d Cir. 1963), supports our view. There a would-be patent infringer brought a suit for a declaratory judgment that the patent in question was invalid. The Second Circuit dismissed the suit for lack of juris-

diction under the Declaratory Judgment Act, 28 U.S.C. § 2201, saying that "[w]here there is no actual manufacture, use or sale, and no immediate intention and ability to practice the invention, there is no justiciable controversy." 315 F.2d at 90. Likewise, here the plaintiff has not alleged that it has attempted, or that it definitely intends, to terminate its obligation to pay royalties. In the absence of such allegations, the question of whether the termination provisions of the agreement constitute misuse does not raise an actual controversy between the parties.

■ Finally, in Count II the plaintiff charges patent misuse by the alleged fraudulent procurement of the '305 patent. Plaintiff cites no case suggesting how this conduct, even if proved, falls within the rule of *Zenith* or any other patent misuse doctrine. We assume, of course, that if the '305 patent is shown to be invalid, it cannot be the basis for royalties, but that does not render the entire licensing agreement an improper attempt to use patent leverage to extend the scope of the patent monopoly.

### III

■ In their cross-appeal, defendants assert that the district court erred in refusing to stay the proceedings pending arbitration under the applicable clause of the licensing agreement.[1] The district court held that the patent validity issue did not fall within the terms of the arbitration clause and that there was no issue ripe for arbitration until the validity of the '305 patent is determined. We agree. It is evident that the parties did not expressly provide for

---

1. The arbitration clause reads:

Any controversy between the parties hereto regarding (1) whether or not certain apparatus sold by Beckman and its subsidiaries falls within the scope of Licensed Patent Rights or Apparatus Subject to Royalty as defined in paragraph 3 hereof or (2) payments made by Beckman to TDC (i) as royalties upon sales of Beckman and its subsidiaries, or (ii) as the share of TDC in royalties paid to Beckman by its sub-sublicensees, or (iii) as the share of TDC in net amounts realized by Beckman from settlements for past infringement, shall be settled and determined by arbitration in the City of Chicago in accordance with the rules and regulations then obtaining of the American Arbitration Association. Judgment upon the award rendered may be entered in any State or Federal Court of competent jurisdiction for purposes of enforcement.

arbitration of patent validity questions. Moreover, we are in accord with the district court's view that such questions are inappropriate for arbitration proceedings and should be decided by a court of law, given the great public interest in challenging invalid patents. Lear, Inc. v. Adkins, 395 U.S. 653, 670, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). As the district court said: "The complex principles of patent law which a court must consider and apply when deciding issues of validity and infringement, affect important questions of public policy and public rights. In considering the validity of patent claims, a court makes decisions crucial not only to the parties involved, but of vital importance to the public generally."

The defendants argue that even if the complaint did not raise an issue referable to arbitration, there is another dispute between the parties which is arbitrable, namely, that regardless of the validity of the '305 patent some royalties may be payable by virtue of the invention claimed in the patent since the agreement licenses applications for patents as well as the patents themselves. They buttress their argument by referring to section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, which provides for mandatory stay of judicial proceedings "[i]f any suit or proceeding be brought in any of the courts of the United States upon *any* issue referable to arbitration under an agreement in writing * * *." (Emphasis added.) The short answer to this argument is that the claim is not one of the issues raised by plaintiff's complaint; in other words, the royalties under the '305 application are not being challenged by Beckman.

We conclude that the district court properly stayed arbitration until the issues raised by plaintiff's complaint are finally determined.

The judgment of the district court is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this decision.