**BECKMAN INSTRUMENTS, INC., a California corporation, Plaintiff-Appellee,**

v.

**TECHNICAL DEVELOPMENT CORPORATION, Defendant-Appellant.**

**No. 83–1136.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1984.

Decided March 22, 1984.

Rehearing and Rehearing En Banc Denied May 2, 1984.

---

Frederick G. Michaud, Jr., Burns, Doane, Swecker & Mathis, Alexandria, Va., for defendant-counterplaintiff-appellant.

Sheldon Karon, Karon, Morrison & Savikas, Ltd., Clemens Hufmann, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for plaintiff-counterdefendant-appellee.

Before BAUER, COFFEY and FLAUM, Circuit Judges.

BAUER, Circuit Judge.

Plaintiff Beckman Instruments, Incorporated sued defendants Technical Development Corporation (TDC) and Franklin F. Offner in July 1976. The dispute between Beckman and TDC arose out of an agreement in which TDC, as Offner's exclusive licensee, sublicensed Beckman with respect to various Offner patents and inventions. Offner was dismissed from the suit.

Beckman and TDC executed the sublicense agreement in conjunction with the purchase by Beckman of Offner Electronics, Incorporated, a firm almost wholly owned by Offner. Fairly extensive negotiations and redrafting of the agreement preceded its execution in 1961. The agreement granted Beckman the right to make and sell products covered by licensed patent rights, which included patents and patent applications held by Offner. The production rights covered all classes of a particular device even though all models may not have been covered by licensed patent rights. Beckman was obligated to pay royalties on the use of the sublicenses.

To make a long, tumultuous story short, Beckman announced termination of the agreement just before it filed this action. Beckman claimed that it no longer made use of any sublicense under the agreement and did not intend to use any in

the future. TDC, on the other hand, argued that Beckman's royalty obligations still existed despite Beckman's assertions. TDC further argued that Beckman still was producing and selling devices covered by licensed patent rights.

The sublicense agreement has commanded our attention in the past. In *Beckman Instruments, Inc. v. Technical Development Corp.*, 433 F.2d 55 (7th Cir.1970), *cert. denied*, 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971) (*Beckman I*), this court considered several issues surrounding Beckman's refusal to pay royalties on an Offner patent and allegations that TDC misused the licensed patents. There this court ruled in part that TDC had not misused its patents. The present action first was decided by the district court on August 16, 1977. Judge Marshall ruled that the language of the sublicense agreement granted Beckman the right to terminate if it stopped producing devices covered by Offner patents. This court reversed and remanded by an order dated September 12, 1978, 588 F.2d 834, ruling only that the language of the agreement was ambiguous and that TDC thus could offer extrinsic evidence in support of its arguments. The district court ruled again on December 20, 1982. In that opinion, Judge Moran held after trial that Beckman indeed had properly terminated the sublicense agreement. TDC appeals that judgment. We affirm.

In this appeal TDC argues principally that Judge Moran's interpretation of the sublicensing agreement is clearly erroneous. We have little difficulty rejecting this contention. Judge Moran ruled after a thorough analysis of all the available evidence that the credible evidence supported Beckman's position. His analysis includes a review of *Beckman I*, Judge Marshall's order, and extrinsic evidence offered by both parties. Our own analysis convinces us not only that Judge Moran has committed no clear error in his analysis, but also that we would reach the same conclusions. For this reason, we adopt Judge Moran's exhaustive analysis as the opinion of this court.

 A second issue raised on appeal is whether Beckman now is precluded from advocating an interpretation of the sublicense agreement termination provisions different from its positions in pleadings and briefs filed in *Beckman I*. Judge Marshall rejected this argument in his opinion of August 16, 1977, and considered Beckman's contrary positions only as other evidence weighing on the termination issue. This court agreed with Judge Marshall's analysis in its September 12, 1978, order, ruling that Beckman was not estopped from maintaining its current position. The order stated that Beckman's earlier positions constituted additional evidence to be weighed with the other extrinsic evidence. On remand, Judge Moran accorded the earlier inconsistent positions "little weight."

TDC still insists that Beckman is barred from shifting its position under the "doctrine of preclusion by deliberate choice." Appellant's br. at 37. Beckman argues contrarily that its position now is not inconsistent with its positions in *Beckman I* and further that any inconsistency does not bar it from advancing its current position. We are compelled to stand by our earlier ruling in this case that Beckman is not estopped from making its argument. First, a substantial question exists as to whether Beckman actually advocated contrary positions in *Beckman I*. In fact, Beckman merely may have been restating positions enunciated by TDC. In any event, the issue involving the seemingly inconsistent positions was not adjudicated by the *Beckman I* court for want of a true controversy. *Beckman I*, 433 F.2d at 61–62. Under the circumstances in this case, TDC cannot claim either that it was disadvantaged or that Beckman gained an advantage by Beckman's positions in *Beckman I*, which were never considered directly by the district court or this court. There is no established inconsistent position; Beckman has not benefited.

 The final issue meriting our separate consideration is whether Beckman in fact made use of a sublicense under the agreement after its July 1, 1976, represen-

tation that it no longer used any sublicense.* If Beckman did use a sublicense, its otherwise proper termination was ineffective.

Among other devices, Beckman sold preamplifiers and input couplers for use with those preamplifiers. The preamplifiers alone did not fall within any of the Offner patents. The preamplifiers in combination with the input couplers were within patent coverage, however, and Beckman paid royalties on all of the devices sold, regardless of whether they were sold in combination. Beckman stopped selling preamplifiers before July 1, 1976, but sold the input couplers at issue here in 1977 to Northwestern University, which had purchased a device with preamplifiers in 1965.

Judge Moran analyzed TDC's claim that the sublicense agreement covered Beckman's sale to Northwestern University as follows. The sublicense agreement required Beckman to pay royalties to TDC when a sublicensed patent was used. A patent is used when use of a device, if unauthorized, constitutes infringement of the patent. An Offner patent was used if the University's use of its newly purchased input coupler infringed a sublicensed patent. If the University's use of its input coupler infringed a sublicensed patent, then Beckman would have acted under the sublicense agreement in selling the input coupler, because the agreement covered all sales implicating an Offner patent.

Judge Moran ruled that Northwestern University reasonably expected to be able to purchase an accessory such as the input coupler for use with its previously purchased equipment, and thus the University could purchase the input coupler from any source without infringing a patent. Because the University did not directly infringe a patent, Beckman could not contrib-

utorily infringe a patent. *See, e.g., National-Standard Co. v. UOP, Inc.,* 616 F.2d 339 (7th Cir.1980). Accordingly, Beckman did not act under the sublicense agreement.

In general, Judge Moran concluded that Northwestern University acted under an "implied license" to purchase the input couplers as additions to its equipment because that equipment had been represented as "all-purpose" and adaptable to many applications when used with appropriate input couplers, including the type the University eventually purchased. We find no fault in this analysis. Beckman did not act under the sublicense agreement by selling an input coupler to the University which the University could have purchased anywhere without infringing a patent. Beckman's termination of the sublicensing agreement was proper.

We affirm the district court's judgment and adopt its opinion, which is reprinted below.

AFFIRMED.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BECKMAN INSTRUMENTS, INC., a California corporation, <br> Plaintiff, <br><br> vs. <br><br> TECHNICAL DEVELOPMENT CORPORATION, an Illinois corporation, <br> Defendant. | ) ) ) ) ) No. 76 C 2488 ) ) ) ) ) ) |

**MEMORANDUM AND ORDER**

In this action Beckman Instruments, Inc. (Beckman) seeks a declaration that it has lawfully terminated a 1961 patent sublicense agreement with Technical Development Corporation (TDC). TDC has counterclaimed for a declaration that the agree-

---

* TDC raises another issue that does not merit attention in the text. TDC claims that Judge Moran improperly denied it the opportunity to present additional evidence with regard to its contention that Beckman acted under the sublicense agreement after July 1, 1976, by selling devices covered by licensed patent rights. Judge Moran blocked introduction of that evi-

dence on the ground that it constituted a separate allegation of infringement. The judge's decision not to significantly expand the issues so late in the course of the litigation clearly was correct. The additional evidence TDC offered actually amounted to an entirely new contention for trial. Judge Moran properly exercised his discretion to bar the evidence.

ment remains in force either because Beckman's royalty obligations are broader than it contends or because Beckman is still producing apparatus covered by an Offner patent and is, therefore, obligated to pay royalties even under Beckman's narrower interpretation of the agreement.

The parties are no strangers to the courts, this agreement having been the subject of litigation, including appeal to the Court of Appeals for the Seventh Circuit, during the period 1966–1971. Thereafter Beckman "evidently redesigned all of its equipment so as to avoid utilizing any of the sublicensed patents." *Beckman Instruments, Inc. v. Technical Development Corporation,* No. 76 C 2488, Memorandum Opinion of Judge Marshall, August 16, 1977. In any event, Beckman, on July 1, 1976, purported to terminate the sublicense agreement and this lawsuit soon followed.

Judge Marshall thereafter, by his Memorandum Opinion, granted summary judgment for Beckman, in the course of which he described in some detail the prior relationship of the parties and their prior litigation. Judge Marshall concluded, on the basis of the language of the sublicense agreement, that Beckman was entitled to terminate the agreement if it ceased to produce apparatus which was covered in any respect by Offner patents. The Court of Appeals, in an unpublished Order on September 12, 1978, reversed, concluding that the sublicense agreement was ambiguous. It there referred to a contrary position taken by Beckman in the earlier litigation. It was troubled by the interrelationship of paragraph 3(g) of the agreement, which defined four named types of equipment as apparatus subject to royalty, without requirement that they be covered by licensed patent rights, and paragraph 5, which provides for payment of royalties on sales of apparatus subject to royalty "under the sublicenses." Also germane was paragraph 12(b), which permits termination of the sublicense if Beckman ceases to make use of any sublicense with respect to any patent, claim, or field of use. Accordingly, it remanded the matter for considera-

tion of any extrinsic evidence bearing upon the interpretation of the agreement.

The case was eventually transferred to this court, which held the evidentiary hearing mandated by the Court of Appeals. Extensive (233 pages) post-trial briefs were thereafter filed, together with the voluminous trial exhibits, arguing both the evidentiary facts and the language of numerous provisions of the agreement. This court's task is to interpret an agreement, in the context of events during May-August, 1961, in accordance with the intent of the parties.

A consideration of how the agreement came to be in the form it was executed is complicated by the passage of time. Certain of the participants in the negotiations have since died. Some, apparently, disclaimed any specific recollection of events so long ago and were not called by either party. Those who testified were recalling events occurring more than a score of years ago. The paper record, as supplemented by the testimony, does, however, provide a basis for drawing factual conclusions.

In 1961 TDC was the exclusive licensee of various patents on inventions of Dr. Franklin Offner for sensing devices useful in various applications. While, for tax reasons, Dr. Offner had only 29% of the stock, it was clear that TDC was an offshoot of his inventive capabilities and was controlled by him. When Beckman first expressed an interest in May 1961 in acquiring Offner Electronics, almost wholly owned by Offner, Offner already had a pending offer from another company, but not a company in a related field. Dr. Offner was interested in discussing acquisition by Beckman because Beckman's prior experience in the field would permit it to take over from Offner the active operation of the business.

The deal was first specifically discussed between W.W. Wright for Beckman and Dr. Offner on May 8 and 9, 1961. Offner's recollection is that the contemplated transaction always involved stock and royalties which would aggregate $13,000,000, comparable to the pending offer. W.W. Wright's

memorandum to Dr. A.O. Beckman (W.W. Wright is deceased) refers to a tentative agreement for $8,000,000 in stock and royalties on "product line sold under the patents," with a $5,000,000 cap. He also, in explaining the "tentative agreement," stated that "Payments would cease on any products line prior to the $5,000,000 when all the patents in use on that patent line expired." Wright expressed similar views to Offner by letter on May 11, 1961, although the reference there was to "products related to your existing patents." While acknowledging that further details would be needed in any final agreement, he termed his letter as stating "the essence of our agreement." The parties obviously understood that the patents were held by TDC and, in any acquisition of Offner Electronics, would be sublicensed by TDC to Beckman. Plaintiff at that time alerted R.J. Steinmeyer, its in-house patent counsel, of the projected transaction, and Steinmeyer initiated a rush assignment search upon Offner Electronics and TDC.

Immediately thereafter, both Wright and Dr. Offner involved others in negotiating and drafting final terms. Offner outlined his views of a proposed merger. That outline provided for $7,000,000 in stock, royalties to Offner Electronics' shareholders on the gross sales of a new Offner Electronics subsidiary of Beckman, regardless of product, as well as royalties on sales by other Beckman entities of direct writing oscillographs and other products made under Offner patents, with a $5,000,000 cap, and $1,000,000 in cash to TDC for royalty-free licenses. Offner sent a copy of the outline to his consultant Morris Glasser, a C.P.A. with a law license, and asked him to meet in California with Beckman representatives to assist in working out an agreement.

That meeting, with a somewhat shifting participation, took place May 16–18, 1961. By the end of it the parties each believed that the negotiations had been largely concluded. Glasser, apparently the only person to take extensive notes, drafted in handwriting his own proposed TDC license agreement, one of the several documents necessary to accomplish the Beckman-Off-ner Electronics merger on May 18, 1961, in which the gross sales base tracked the provisions of the Offner outline. His recollection is that he then rewrote the license proposal, which Wright initialed with the "gross sales" definition crossed out and replaced by a royalty proposal signed by Wright and Offner covering all direct writing oscillographs, all amplifiers (if sold outside the company), and all other Offner products if covered by patents and patent applications.

In the meantime, Robert J. Steinmeyer, Beckman's patent counsel had been drafting in Chicago his own outline of a license. That outline, sent to Beckman's general counsel and to Wright as well as others on May 18, 1961, confined the royalty base to products covered by patents and introduced the concept of early surrender or termination, prior to payment of $5,000,000 or the expiration of the last patent. The following day Steinmeyer circularized his view that the royalty obligation should not extend to unallowed claims. Shortly thereafter Steinmeyer received a copy of Glasser's draft. Following closely thereafter was another memorandum from general counsel to Steinmeyer further elaborating upon the gross sales concept in the royalty redefinition of the Glasser draft.

On May 27, 1961, Steinmeyer circularized his draft license agreement to Beckman personnel, with specific attention being drawn to his view that Glasser's May 18 outline specified that royalties might be payable on products not covered by the Offner patents. He suggested that the royalty base needed more attention. Steinmeyer's May 27 draft established the basic form in which the license was ultimately executed. Its definition of apparatus subject to royalty did not tie the primary covered devices to patents but it did tie them to Offner Electronics' then current production and introduced, in paragraph 5, reporting on "apparatus subject to royalty sold under the sublicense." It included, as paragraph 12(b), a right in Beckman to surrender and terminate all rights under the licensed patent rights upon notice and

thereby be relieved of paying further royalties. A revised draft of July 11, 1961, again incorporated the early termination provision. Steinmeyer's cover letter expressly recognized that the draft defined apparatus subject to royalty to include oscillographs and amplifiers outside the scope of patent coverage.

This draft prompted intra-Beckman discussion, including the royalty base definition, and a revised draft was forwarded to TDC on July 21, 1961. Glasser noted objections to the early termination provision, and Offner crossed it out on his copy but did not refer to that objection in his detailed response to Beckman on July 24, 1961. He did, however, prepare a revised draft which deleted paragraph 12(b).

A Steinmeyer memorandum on July 28, 1961, indicates that Dr. Offner had suggested a revised paragraph 12(b), providing for early termination of any sublicense with respect to any patent, claim, or field of use, with termination only to that extent. The suggested language was carried over into the final agreement of August 2, 1961. That agreement, for reasons not explained at trial, also expanded the royalty base to include electroencephalographs and electric shock therapy apparatus not within patent claims.

The agreement, as executed, dropped Steinmeyer's May 27 draft language tying the apparatus subject to royalty to Offner Electronics' current production for the primary devices covered by the sublicense, while retaining the requirement that other apparatus be covered by an allowed or pending claim. This was the paragraph, 3(g), which the Court of Appeals considered, with paragraph 5, to cause an ambiguity in the contract. Paragraph 5 requires reports and payments on apparatus subject to royalty "under the sublicenses." Finally, paragraph 12(b) reads as follows:

(b) If Beckman does not make use of any sublicense granted hereunder, with respect to any patent, claim or field of use, and if Beckman further declares in writing to TDC that it has no wish in the future to use such license or claim, or to engage in such field, then the sublicense granted hereunder shall to that extent only be terminated.

The licensed patent rights are, in paragraph 3(e), defined to include, *inter alia,* various patents and patent applications listed in an exhibit to the sublicense.

In the spring and summer of 1961 the context of the negotiations appears reasonably clear. Dr. Offner wished to sell Offner Electronics and to transfer the related TDC patent sublicenses. He had an attractive offer from American Brake Shoe, but he was disinclined to be as involved in future operations as that sale portended. Beckman was seeking acquisitions in related fields. The parties were a willing seller and a willing buyer, so long as the transaction could be structured to comply with tax accounting objectives and the price was satisfactory to both. A stock-plus-royalty structure met those strictures and Dr. Offner was agreeable to such a transaction so long as the expectable royalties were $5,000,000.

The Glasser notes of the May 16–18, 1961, meeting in Fullerton, California reflect the complexity of the transaction. Only a portion of the time was devoted to the TDC sublicensing of patent rights. The participants were well-versed in the tax and accounting considerations which dictated the stock-plus-royalty structure, and familiar with the relevant areas of interest in accomplishing such a transaction, but, with the exception of Dr. Offner, none was intimately familiar with patents and patent licenses. Wright had, in his May 11 letter to Dr. Offner and his memorandum to Dr. Beckman, indicated his understanding that royalties related to patent use, but in the memorandum his "sold under the patents" was qualified by a reference to payments on a product line until all patents in use on that product line expired. That qualification, if it had been embodied in an agreement, would have resulted in obligations less than TDC contends and more than Beckman now recognizes. Glasser, in his notes and in his handwritten and somewhat sketchy draft

sublicense, makes no reference to patent coverage or product related to patents, and Wright, in furnishing it to Steinmeyer as the basis for a draft sublicense, did not indicate any discomfort with the omission of such a reference.

The various negotiators did not include Steinmeyer directly. He was, however, the one experienced patent counsel, and he soon became, for Beckman, the voice of caution in the drafting of the sublicense agreement and, for both parties, its principal draftsman.

Dr. Offner and Glasser initially sought broad royalty coverage of all production. Steinmeyer, from his vantage in the corporation, would have preferred a royalty arrangement directly related to patent coverage of specific devices. That was, however, not the arrangement Wright was prepared to accept and had accepted at the May 16–18 meeting. Rather, Wright was agreeable to a broader royalty clause, a clause which granted royalties to TDC, with certain exceptions, on all direct-writing oscillographs and amplifiers (and, later, electroencephalographs and electric shock therapy apparatus). That grant, as Steinmeyer recognized, imposed upon Beckman royalty liability for devices not covered by any of the licensed patent rights. He was, however, satisfied that those rights then covered much or all of Offner Electronics' current production. The license, as drafted, imposed royalty obligations for all production of a class of device even though the licensed patent rights covered only some of the models.

What, then, if at some future time none of the models of that class of device was covered by the licensed patent rights even though the last-to-expire patent included in the licensed patent rights still had time to run? Steinmeyer, in drafting his proposed paragraph 12(b), clearly intended to give Beckman a right to terminate in those circumstances. He, like Dr. Beckman, did not wish to have Beckman paying something for nothing. It is also reasonable to infer that Steinmeyer wished to avoid the then valid concept of license estoppel.

TDC contends the deal was $5,000,000, payable as royalties, and that Dr. Offner would not have approved the transaction if it were for less than $13,000,000. That contends too much, as an agreement to pay $5,000,000 regardless of sales would have destroyed the tax objectives pursued by the parties, and would have been a fraud on the Internal Revenue Service and investors. The question was never whether there would be any risk of TDC not receiving $5,000,000; the question was the acceptable degree of risk, and the negotiations in that respect focused on royalty coverage.

Clearly, Dr. Offner expected that royalties would reach $5,000,000. Clearly, in his own mind, he believed he was negotiating a $13,000,000 package. Just as clearly, however, the parties were, for tax and accounting reasons, structuring a royalty arrangement which was not a subterfuge but which did provide for a broad royalty base. The credible extrinsic evidence indicates, however, that the parties never did, anywhere in the negotiations, mutually discuss and rationally decide what the royalty obligations would be if Beckman ceased to produce any devices in a product line covered by licensed patent rights. Wright appears to have assumed that it was agreed that there had to be some relationship to those rights, even though there were subsequent patentable improvements. He so indicated both in his May 11 correspondence and in his July 20, 1961, memorandum. His acquiescence, and the acquiescence of other Beckman personnel involved in the transaction, in the Steinmeyer draft sent to TDC is consistent with that assumption. The failure of the Offner negotiators to seek language which clearly obligated Beckman to pay royalties on all products, even if no licensed patent rights were involved—surely an unusual obligation for a licensee to assume—and their failure to object to the proposed paragraph 5 or to state in writing that basis for objecting to paragraph 12(b), are inconsistent with there being the intent of the parties claimed by TDC.

Once Steinmeyer became involved, some termination provision and a payment and reporting provision tied to the sublicenses were consistently in the Beckman drafts. Such a provision was not inconsistent with Wright's May references to patents. Steinmeyer's efforts initially to tie the royalty base directly to patent coverage and, later, to restrictively defined apparatus was inconsistent with the early and consistent agreement between the parties for a very broad royalty base, and those efforts were not fruitful.

The history of paragraph 12(b) is somewhat confused. Dr. Offner testified that Wright agreed to deletion of Steinmeyer's 12(b). That testimony, a new recollection 20 years later, appears to be illustrative of the human tendency for rationalizing the past to explain the present. The court believes Dr. Offner's recollection to be in error. Dr. Offner also claims that his suggested termination provision related to his wish to be free—in his employment relationship with Beckman—to pursue areas in which Beckman no longer had an interest, without having the fruit of his efforts going to Beckman.

Perhaps that was Dr. Offner's motivation for the suggestion, although, again, he was relying upon recollections of his state of mind 20 years ago. (Throughout, this court has found, because of the passage of time, the past paper record more persuasive than present testimony). Even if that is so, the record establishes that Steinmeyer was not privy to those concerns or, indeed, to Dr. Offner's or Glasser's concerns about Steinmeyer 12(b). Rather, within a few days of his circularizing the last draft, Steinmeyer had a call from Dr. Offner in which Dr. Offner suggested termination language different from Steinmeyer 12(b) and less precise, but language which clearly satisfied the concerns Steinmeyer had consistently expressed.

How that new clause became a replacement for the old paragraph 12(b) is also unclear. Steinmeyer does not recall talking to anyone about it except Dr. Offner. Given his role as the initiator of license language and as intra-Beckman reviewer of the impact of language, but not as negotiator, it is likely he talked to someone. That is particularly so since the new provision, while providing a mechanism for terminating sublicenses, did not, as had the prior clause, eliminate license estoppel from the license. Perhaps that elimination was what Dr. Offner had in mind in dropping such a clause from his last draft, but that, of course, is at this juncture speculation.

TDC insists that the Beckman contention that paragraph 12(b) related to the royalty base of a product line so long as, but only so long as, one product in the line was covered is somehow a new concept introduced by a desperate Beckman at this trial. But that concept was central to Judge Marshall's interpretation of the agreement back in 1977. Further, this court agrees with Judge Marshall's analysis of the "prior inconsistent positions" contentions raised by TDC, and it accords them little weight.

Finally, this court largely agrees with Judge Marshall's contract analysis, an agreement which rests in no small part upon the extrinsic evidence introduced since that analysis.

There remains one other issue. TDC contends that Beckman has not ceased to make use of a sublicense and that, therefore, even if paragraph 12(b) permits termination, Beckman's purported termination is ineffective. The dispute relates to Beckman's sale of 9872 input couplers, plug-in modules used with dynographs. A dynograph is a direct-writing oscillograph designed to monitor and record diverse conditions such as heartbeats, brain waves, temperatures, vibrations, and blood pressures, and the like. The dynograph receives through an input coupler a signal and, after amplifying the signal, uses it as a means for a mechanical recording. A preamplifier is a component of the dynograph.

It is essentially undisputed that Beckman, prior to July 1, 1976, sold 481B and 461B preamplifiers, with and without 9872 input couplers; that the 481B and 461B

preamplifiers did not alone come within any claims of Offner patents; that 481B and 461B in combination with a 9872 input coupler are within patent coverage; and that Beckman, in view of the broad royalty provisions, paid royalties on all 481B, 461B, and 9872 units sold, whether or not they were sold in combination. It is also essentially undisputed that Beckman ceased selling the 481B and 461B preamplifiers after July 1, 1976, and that it thereafter marketed a preamplifier which did not, in combination with the 9872 input coupler, make use of a sublicense. It is also essentially undisputed that Beckman has, from time to time since July 1, 1976, continued to sell 9872 input couplers to prior purchasers of 481B and 461B preamplifiers.

The 481B and 461B preamplifiers permitted the use of various input couplers, of which the 9872 was one, for use in various applications. The Offner combination patent claims brought the use of some input couplers, not relevant here, with the preamplifier within the coverage of the claims of one patent, even though the components are not themselves patented; the use of various other input couplers with the preamplifier is not within the coverage of any patent. Finally, the Beckman preamplifier marketed after July 1, 1976—its Model 461D—similarly makes provision for the use of various input couplers, of which the 9872 is one. The combination of the 461D and 9872 does not infringe any Offner patent. An input coupler is, essentially, a wire means for conveying a signal from the recording device to the preamplifier; it is itself a relatively simple device.

Prior to July 1, 1976, Beckman sold 481B and 461B preamplifiers separately and paid royalties on each, not because they were each patented but because they were within the reach of the royalty provisions. Clearly, also, in the absence of the sublicenses, it would have been liable for contributory infringement if it had sold, as separate units, a 9872 coupler and either a 461B or 481B preamplifier to the same person in order that that person could use the patented combination.

TDC now contends that the present sales of 9872 couplers must be sales "under a sublicense" because the prior sales of those couplers were under a sublicense. The short answer is that prior sales of such couplers together with a 481B or 461B preamplifier were sales under a sublicense, and that royalties were, as a result, measured by, among other things, the sale of 9872 couplers whether or not they were under a sublicense. The issue here is whether Beckman, in selling 9872 couplers, made use of a sublicense because it otherwise would be liable for contributory infringement or for inducing direct infringement. And Beckman cannot be so liable unless someone directly infringed.

TDC's contention arises from Dr. Offner's testimony that Northwestern University had a dynograph with a 481B or 461B preamplifier, apparently purchased in 1965, and that it purchased a 9872 input coupler from Beckman in 1977. The dynograph is a major piece of equipment. Purchasers paid a royalty through the purchase price because of the sublicense agreement. The equipment was promoted as versatile and adaptable to a number of applications by the use of 9800 series input couplers. There were no indications of any patent restrictions in the use of any 9800 series input couplers. It would surely have come as some surprise to Northwestern University in 1977 if it had been told that it thereafter was restricted in the use of its equipment to applications which used certain 9800 series input couplers but could not use it for other applications.

The facts are not squarely within the axiom that the "sale of a patented article by the patentee or under his authority carries with it an 'implied license to use.'" *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 484, 84 S.Ct. 1526, 1531, 12 L.Ed.2d 457 (1964), because the dynograph itself was unpatented and it could be used in some applications without infringing the patent. By TDC's theory, purchase of a 9872 input coupler may not be a replacement at all, whether repair or reconstruction, but the purchase

of that which completes the patented combination. While the evidence leaves unclear the reasons why Northwestern University made its particular purchase, it is clear that Beckman since 1976 has promoted the sale of 9872 input couplers to owners of 461B and 481B preamplifiers without regard to whether or not they had ever purchased such a coupler before.

Superficially, those facts bear some resemblance to those in *Leeds & Catlin v. Victor Talking Machine Co.*, 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816 (1909), but the days when the purchase of a record for a talking machine was a major event are far removed from a market in which complicated equipment is promoted for multiple uses through interchangeable accessories. Unless he is told otherwise at the time of sale, the purchaser quite reasonably expects that he can acquire those accessories necessary for full use of the equipment without running afoul of the patent laws. The concept of implied licenses has been somewhat impacted by the fact situations in which it has been discussed, by the effort to reach rational results through a distinction between reconstruction and repair, and by the changing symbiotic relationship of contributory infringement and patent misuse, *see Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980). An implied license ultimately, however, must rest upon reasonable expectations induced by the patentee. A form of implied contract, it stems from the same legal reasoning which gives rise to the implication from the conduct of the parties of indefinite terms in an otherwise definite contract and to promissory and equitable estoppel. A person cannot induce reliance by another and then change the rules of the game. And a purchaser of major equipment, a transaction knowingly authorized by the patentee without any restrictions, most certainly reasonably expects that he can acquire whatever accessories are necessary for all the uses contemplated and encouraged upon sale, whether or not some use or another may be within the coverage of a patent and regardless of any change in the relationship between supplier and patentee.

If, as this court concludes, the sale of the dynographs prior to July 1, 1976, implied a license to use with whatever couplers were necessary or appropriate for full use, even if such couplers in combination with the preamplifier would infringe a patent, the purchasers were free to acquire those accessories anywhere. Accordingly, Beckman, in making a sale of a 9872 input coupler, was not relying upon any sublicense granted to it. Further, absent direct infringement, there could be neither contributory infringement nor inducement to infringe. It is, therefore, unnecessary to discuss the contributory infringement and inducement contentions advanced by the parties.

For the reasons stated, judgment is granted to the plaintiff.

/s/ James B. Moran

JAMES B. MORAN

Judge, United States District Court

December 20, 1982.