**FMC CORPORATION and Vulcan Equipment Company, Ltd., Plaintiffs,**

v.

**HENNESSY INDUSTRIES, INC., Defendant.**

**No. 79 C 4660.**

United States District Court, N.D. Illinois, E.D.

Dec. 24, 1986.

Gerald D. Hosier, Hosier & Sufrin, Ltd., Raymond P. Niro, Thomas G. Scavone, Niro, Jager & Scavone, Ltd., Richard B. Megley, FMC Corporation, Chicago, Ill., for plaintiffs.

Thomas H. Morsch, Robert R. Watson, Sidley & Austin, Michael O. Warnecke, William J. Birmingham, Theodore W. Anderson, Neuman, Williams, Anderson & Olson, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This litigation is but one facet of ongoing commercial warfare with a tenacity and duration rivaling the Peloponnesian War. And this memorandum and order relates only to the first facet of a trifurcated litigation. The parties, after over 3500 pages of trial testimony and numerous depositions and exhibits, filed post-trial briefs in excess of 450 pages, and this court, after long delay, is finally prepared to rule. Unlike many patent cases this litigation has

been fact-intensive, turning on "who, what, where, when" primary facts. Like many patent cases, however, it has also been dominated by claims of inequitable conduct ("fraud") in the Patent Office. Rulings thus require an extensive review of those facts, although by no means in the wealth of evidentiary detail argued in the post-trial briefs.

Hennessy Industries, Inc. ("Hennessy/Coats") is the assignee of three patents on power tire changers which it claims are infringed by tire changers sold by FMC Corporation ("FMC/Vulcan"). FMC/Vulcan denies infringement. It further contends that each of the patents is invalid or, in any event, is unenforceable. Each party seeks attorneys' fees and, in the case of Hennessy/Coats, treble damages, on the ground that the other was a particularly egregious wrongdoer.

Predecessors of the present Hennessy Industries, Inc. were distributors for an Iowa company, Coats Company, which manufactured manual and semi-power tire changers. In January 1962 Hennessy Industries, Inc. acquired the assets of Coats Company and thereafter continued to manufacture and distribute tire changers under the Coats trade name. Manual and semi-power tire changers had become increasingly popular after the Second World War, after the introduction of safety rims increased the physical effort necessary to remove a tire from a wheel. Tubeless tires were introduced in 1954 and their removal was even more difficult. Their increasing use created a potential and growing market for full-power tire changers. It cannot be said that by 1962 there was a long felt need for full-power tire changers to which there had been no adequate response, but certainly the time for profitable commercial exploitation had arrived. The name and distribution facilities of Hennessy/Coats provided a solid base for the addition of full-power tire changers to the Hennessy/Coats line, but a major contributing factor to Hennessy/Coats dominance in the full-power tire changer industry thereafter was its acquisition and exploitation of patent rights.

The first, and by far most important, of these was the Tabordon patent 3,255,801, filed March 14, 1962, issued June 14, 1966, and now expired ('801 patent). Much of the controversy in this litigation relates to the events leading up to the filing of that patent application and what was known or should have been known, and when, by persons connected to Hennessy/Coats. Hennessy/Coats claims that it first learned only after this litigation was filed of a semi-power version sold prior to March 14, 1961 (the critical date for purposes of 35 U.S.C. § 102), and that it then promptly disclaimed claim 1, the only claim which arguably but by no means certainly was anticipated by the earlier device. FMC/Vulcan does not argue, at least not seriously, that the Tabordon full-power tire changer was anticipated by prior art other than by the semi-power device. It contends, however, that the full-power tire changer was in public use or on sale in this country more than one year prior to the date of application, in contravention of 35 U.S.C. § 102(b); that even were that not so the full-power tire changer was obvious in light of the prior art, which included both the Tabordon semi-power tire changer and other full-power changers and therefore not patentable under 35 U.S.C. § 103; and that it has shown by clear and convincing evidence that Hennessy/Coats was guilty of inequitable conduct in the Patent Office, not only prior to the filing of the Tabordon application but also thereafter, both with respect to the '801 and other patents.

That takes us, then, both to a determination of what happened in northern Wisconsin during the late winter of 1961, as reconstructed a score or more years later, and what people knew or should have known (in a fraud in the Patent Office sense) about those happenings. A determination of the primary facts leads to the application of a legal standard about which there can be relatively little room for argument: whether the evidence supporting facts establishing a statutory bar or obviousness is so clear and convincing that it overcomes the presumption of validity.

Royal C. Tabordon had either died or was seriously ill when this case was tried; the court does not recall. While he had been deposed on several occasions he did not testify at trial. His deposition transcripts reflect an aging and ill witness of uncertain hearing and memory rather fiercely protected by his attorney and spouse. What we do know from him and others is that Tabordon had four or five years of schooling, could speak and understand English adequately although his native language was Walloon, and wrote English poorly. He lived in Casco, Wisconsin, where for a number of years he bought and sold cattle and, thereafter, in the '50s or earlier, made tire changing tools of his own devising in his barn. The devising was solo; he sometimes had a helper to construct the equipment he sold. Sometimes he peddled his equipment himself. At other times he relied on others in the locality for distribution. It was, at least until he sold out to Hennessy/Coats in 1962, a marginal livelihood. Tabordon had some knowledge of patents, including the concept of a statutory bar and the desirability of establishing a record of when he conceived of an idea, and, through a Green Bay, Wisconsin, patent attorney, Stanley Binish, he had filed and prosecuted prior patent applications. The record does not establish, however, that he had any real understanding of what was patentable, as opposed to what he considered a good idea, or that he understood the legal meaning or implications of claims language, reduction to practice and the like.

Well prior to the critical date Tabordon developed and sold the "EZ tire changer:" a semi-power tire changer with diametrically opposed upper and lower bead breakers (shoes to break the tire bead from the rim) powered by a single power source to break the beads loose in a single-powered operation through the use of a pneumatic piston. That semi-power device anticipated (and not just arguably) claim 1, which Hennessy now disclaims. FMC contends that the full-power tire changer was also in public use or on sale before the critical date and that, in any event, the full-power tire changer was obvious when the semi-powered unit is considered, as it must be, as prior art.

We turn, then, to the evidence concerning the first contention relating to public use or sale. Here the court relies more on documentary evidence than testimony, or at least testimony which is not otherwise corroborated by the paper record. *United States v. Kairys,* 600 F.Supp. 1254, 1260 (N.D.Ill.1984), *aff'd* 782 F.2d 1374 (7th Cir.), *cert. denied,* 476 U.S. ——, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); *Beckman Instruments, Inc. v. Technical Development Corp.,* 730 F.2d 1076, 1080 (7th Cir.), *cert. denied,* 469 U.S. 858, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). We do know that Tabordon was producing the semi-power unit, the EZ tire changer, by at least late 1960. An August 1960 photograph depicts the machine. Further, Tabordon entered into a distribution agreement for that unit and any improvements on October 31, 1960. An advertisement for that unit appeared as early as January 1961. Tabordon tire changers were on display at a Milwaukee trade show at the beginning of March, 1961, and also by that time a promotional piece had been prepared.

The chronology of the full-power machine is less certain. Some things are certain. An affidavit filed in the 1965 interference proceeding pushes possible reduction to practice back to December 1960. Tabordon sent himself a January 28, 1961 sketch of the full-power by registered mail on January 31, 1961. Sometime in February 1961 Gerald Simonar had such a unit for use at his service station in Luxemburg, Wisconsin. Tabordon himself, back at the time of the application, represented that the first sale was March 15, 1961, although he asked that the application be completed by March 1, 1962, for "business reasons." James Hennessy, prior to the application, represented to Hennessy/Coats patent counsel that the sale was on March 24, 1961. William Ballo obtained by purchase a full-power tire changer, probably on March 27, 1961.

■ Hennessy/Coats argues that the machine was not reduced to practice until some indefinite time because of design problems with the cable mechanism which rotated the spindle, as well as other problems which persisted into the first commercial Coats model. FMC/Vulcan contends that the use of the tire changer at the Simonar service station was a public use prior to the critical date. The court disagrees with both contentions. The evidence is clear that the tire changer at the service station did change tires as it was designed to do. It was not, however, very dependable, Simonar did not use it very long, and Tabordon came in to tinker with it. Tabordon left the machine at the service station to see how well it would operate in a commercial environment, a practice he has followed with various other tire tools in the past. Simonar got some use from it at no expense to him, but he did not purchase it or pay anything for its use, and there never was any intention that he do so. Tabordon, after a brief period, took it back for more tinkering. This court finds, accordingly, that the tire changer was by then reduced to practice but that the use was not a public use acting as a statutory bar.

The tire changer was then operable and commercially marketable in the sense that it worked for its intended use. Simonar relied upon it to change tires, and it worked for that purpose, and, indeed, a number of substantially identical full-power changers were thereafter sold. The tire changer was not, however, commercially satisfactory in the sense that it was not sufficiently dependable for continuing use in a commercial environment. But that degree of perfection is not a requirement for reduction to practice. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831 (Fed.Cir.1984). The use at the Simonar service station was in a somewhat public place, but testing on the commercial premises of another, to his benefit, does not alone create a public use bar. The purpose was to determine effectiveness in a commercial setting, Simonar did not pay for the use, the duration of the use was

limited, and the use reflected a continuing practice and relationship by which an inventor in a small community could test and refine his concepts. This court is persuaded that the use was not a public use within the meaning of 35 U.S.C. § 102(b). *See Hycor Corp. v Schlueter Co.,* 740 F.2d 1529 (Fed.Cir.1984).

That February 1961 use does, however, reflect the rather confined time frame upon which the parties necessarily focussed in contending that a critical event occurred (or did not occur) before March 14, 1961. If the full-power tire changer had been previously reduced to practice, as this court believes, then it was not only offered for sale but sold to William Ballo by no later than March 27, 1961, when he took delivery of a full-power machine. Does the evidence, clearly and convincingly, establish a statutory bar event two weeks or more before? This court is persuaded that it establishes two such events.

Tabordon had developed a full-power machine at the end of 1959 or shortly thereafter, which he abandoned as too slow and cannibalized for parts. He thereafter developed the semi-power. By October 1960 that device, termed the EZ tire changer by the principals of Continental Distributor, was susceptible to commercial exploitation. What the status of the relevant full-power was at that time is unclear. Tabordon claimed that there was no full-power device prior to the January 28, 1961 sketch. Other evidence indicates that the principals of Continental Distributors had seen some kind of prototype prior to one of them contracting with Tabordon on October 31, 1960, and it was the expectation of a full-power which fueled their enthusiasm. The then distributor of the EZ tire changer began then to solicit sales of that semi-power device, had a brochure printed and placed advertisements. They continued to press, however, for the full-power machine and Tabordon, strapped for funds, sought to accommodate them.

An offer for sale required two happenings: the availability of a unit and the offer of it for sale. The availability depended

upon Tabordon. The offer for sale depended upon the distributors, and Tabordon had little knowledge about what they were doing and when. Promotional material, advertisements and displays were solely up to them. For both Tabordon and the distributors it was very much a shoestring operation. The two or so salespersons picked up units from Tabordon for cash and then peddled them to service stations and the like by demonstrations of tire changers mounted on a trailer hitched to the back of an automobile.

David D. Baldwin, self-styled national sales manager, attended the Wisconsin Petroleum Association trade show in Milwaukee on March 1 and 2, 1961, where Continental Distributors had a booth. There can be no real dispute about the date or the attendance. Both are documented. Nor is there any real dispute that such a demonstration of the full-power would be a statutory bar. *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 684 (7th Cir. 1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978). The dispute centers on what was demonstrated there. Tabordon had no recollection, but, in view of his isolation from any sales effort, that is not surprising. Baldwin, both at deposition and at trial, was certain that he demonstrated the full-power at the trade show and that he had a full-power brochure for that purpose. No such brochure has been located but it is highly probable that such a brochure was prepared some time, given the distributors' interest in the full-power. Continental Distributors' payments support the conclusion that the EZ brochure was prepared in the fall of 1960 and that a second brochure was prepared in early 1961. Finally, in view of the nature and location of the trade show and the immediacy of the Ballo sale, it is highly probable that the distributors should have wanted to demonstrate the full-power, which was at most a few days from initial sale.

This court is also persuaded that the full-power was demonstrated to Ballo on March 11, 1961. Tabordon had earlier received a check for $500 from Continental Distributors, which could have been in payment for demonstration tire changers, although at his deposition he claimed it was a loan. At his deposition Ballo believed a $25 check with a March 11 date to John P. Hillmer was a downpayment, with delivery on March 27, 1961. At trial he was far more uncertain. Both he and Hillmer agreed, however, that Ballo bought the tire changer as a result of a demonstration in south Milwaukee. It may well have been that the first check was for accessories (although the two checks appear to approach the expectable selling price of a full-power), but the evidence strongly supports the conclusion that Ballo was solicited but once, that being March 11, 1961; it is clear that he purchased a full-power; and the logical conclusion is that the full-power was demonstrated on March 11, at which time he agreed to purchase it for later delivery. That sequence may possibly explain Tabordon's reference on one occasion to March 15, 1961 as the critical date (a date when Continental Distributors apparently paid Tabordon for four machines) and on another occasion to March 24, 1961 (when he may have delivered the full-power to Hillmer).

■ We conclude, as well, that regardless of the presence or absence of a statutory bar, the '801 patent is invalid by reason of 35 U.S.C. § 103. The January 1961 advertisement for the EZ tire changer could not be an anticipation, as it did not disclose how the device could be constructed. The EZ tire changer was, however, already in public use and for sale before the critical date and the device itself was, therefore, prior art to the full-power changer. This court concludes that the invention claimed in the '801 patent was obvious in light of that prior art.

The history of the development of the semi-power is somewhat confused, primarily because Tabordon's recollection of events was confused. At his first deposition he testified that he worked on the semi-power and the full-power at the same time, the semi-power being a cheaper model. More than two years later his testimo-

ny was that the full-power concept came after he developed the semi-power, that the semi-power return sequence resulted from the weight of the piston and bead breakers, that the semi-power had a vicious return sequence (presumably because of a spring recoiling without substantial restriction), that this "vicious" action was resolved by a dashpot, that the addition of a dashpot led to the idea of the semi-power as the basis for a full-power, and that the semi-power never had a dashpot. Not all that can be so, although it appears certain that the full-power prototypes were, because of Tabordon's lack of funds, modifications of existing semi-power tire changers. Further, the standard is not what Tabordon thought obvious in light of his previous conception, but what would have been obvious at the time the invention was made to a person having ordinary skill in the art.

The parties are not in serious disagreement about what is ordinary skill in the art, which can be described as the skill of a technically competent engineer with experience in the field of tire changers. The prior art then disclosed, in Bishman patent 3,032,094, the concept of a full-power tire changer, although that patent disclosed two power sources rather than a single power source. Tabordon's semi-power disclosed what was claimed in (the later disclaimed) claim 1 of the Tabordon patent in all respects. That device and the claim included diametrically opposite upper and lower bead breaking shoes moving concurrently during a single-powered operation to break the tire beads loose. It was that feature which was commercially emphasized by Hennessy/Coats as "counterthrust." The claimed infringement is, however, of claims 3, 4, 13–15, 18–20 and 23, none of which reads directly upon the semi-power. All relate to full-power devices and, as Hennessy/Coats has asserted, "variously define the patented invention."

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966), teaches us that obviousness should be evaluated in light of the scope and content of the prior art, differences between the prior art and the asserted claims, and the pertinent level of ordinary skill. Such secondary considerations as commercial success, long felt but unresolved needs and failure of others may be relevant. A patent is presumptively valid, and that presumption can be overcome only by clear and convincing evidence. The failure to cite material prior art to the Patent Office does not destroy the presumption, but that prior art may itself be sufficient clear and convincing evidence of obviousness.

As previously discussed, the need for a full-power tire changer was recent and apparent. Bishman '094 used two power sources for a full-power operation, with one of the power sources being electrical. That created at least a perceived safety hazard. According to one Tabordon version of events, one urged by Hennessy/Coats, Tabordon added a dashpot to the semi-power to dampen mechanism movement and, from that modified semi-power, conceived the concept of powering the spindle from the same power source. Tabordon's deposition testimony indicates that he considered that to be an obvious improvement and was primarily concerned with how to accomplish it. But he, the inventor, is not the standard. Rather, the question is whether a technically competent engineer with experience in the field of tire changers would have considered the conversion of the semi-power to full-power operation and the means by which Tabordon accomplished that conversion to be obvious. The court is convinced that he would.

Many patents reflect conceptions which are inextricably interrelated with their reduction to practice. Here there was more discretely an idea, the conversion of the semi-power to full-powered operation, followed by a design process to give reality to that idea. This court has no doubt that the semi-power could have been the basis for a valid patent. It was, this court believes, an inevitable and obvious step to one skilled in the art also to connect the power source to the spindle and provide a return means after the spindle had rotated to demount or mount a tire. Indeed, Tabordon came to

view the semi-power as a cheaper model of the subsequently patented device. That is not to say that adding the return means was a simple matter. Tabordon was, in the phrase of one witness, a barnyard mechanic. His cable mechanism was at first too insubstantial, and at all times prone to frequent failures. The first Hennessy/Coats commercial versions, the 990, also used a cable system, although a more sturdily constructed one, and it too suffered from field problems as a result. Using the same power source to rotate the spindle and provide a return means was, however, an obvious progression, and connecting the power source to the spindle and devising a return means were, this court concludes, a mechanical design exercise well within the capabilities of one skilled in the art. Stated another way, the means developed to accomplish an obvious advance was not itself inventive but was, rather, a somewhat crude and obvious means of providing full power. The court agrees with the views expressed by William G. Bosene on that subject.

Accordingly, this court concludes that the device claimed in the various Tabordon patent claims at issue here was obvious from the EZ tire changer and Bishman '094 to one ordinarily skilled in the art, and that those claims of Tabordon '801 are therefore invalid.

While that could end the inquiry respecting the claim of infringement of Tabordon '801, this court chooses to discuss the FMC/Vulcan "fraud in the PTO" defense of enforceability for two reasons. One is that the same defense is raised as to the other two patents at issue here and the legal standards must be discussed in any event. The other is that the matter was fully litigated in the first trial and its resolution here will have an impact upon further proceedings. We turn, then, to the legal standard.

■ That standard has been within the recent past the subject of considerable discussion in the Federal Circuit Court. A putative patentee has no duty to search for prior art and, therefore, he has no duty to disclose that of which he reasonably could have become aware if he had engaged in such a search. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The applicant does, however, have a duty to disclose material prior art of which he is aware, and prior art is material if it would, pursuant to Patent Rule 1.56, be important to the patent examiner in making his decision. *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553 (Fed.Cir.1984), *cert. denied*, 474 U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985); *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144 (Fed.Cir.1983). The withholding need not rise to the level of intentional fraud, although it must be more than the result of simple negligence. *Orthopedic Equipment Co. v. All Orthopedic Appliances*, 707 F.2d 1376 (Fed.Cir.1983). Fraud in the Patent Office connotes a degree of culpability akin to gross negligence or bad faith and is best described as inequitable conduct. *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d at 1559–1560. Culpability and materiality are intertwined, and they should be balanced; *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437 (Fed. Cir.1984); *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d at 1363. If inequitable conduct is proved by clear and convincing evidence the patent is unenforceable. *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d at 1561.

■ FMC/Vulcan contends that standard has been met by the conduct of a number of individuals, individually and by collective imputation. *USM Corporation v. SPS Technologies, Inc.*, 514 F.Supp. 213 (N.D.Ill.1981), *vacated on other grounds*, 694 F.2d 505 (7th Cir.1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983). The notion of culpability is, however, antithetic to the concept of imputed knowledge. We necessarily must review the conduct of each of the actors, and that review leads to the conclusion that fraud in the Patent Office has not been proved by clear and convincing evidence with respect to the Tabordon patent.

The first actor is Tabordon. He did not disclose the EZ tire changer to his patent counsel. As discussed earlier, he had some experience and familiarity with the patent system, including the importance of date of first conception and the existence of statutory bars. He had, however, limited education and no legal training in patent law. I am not at all persuaded that he recognized the relevance or even materiality of the EZ tire changer (and it was material) so that he knew he should have disclosed it. He did know of the one-year bar, but I am persuaded that March 14, 1962 was the earliest date he believed could be critical and that a date shortly thereafter, March 24, 1962, was probably more appropriate. He was not involved in the marketing except to sell the tire changers to the distributor upon request. Indeed, if he had thought that an earlier date was a possible bar there is no reason why he would not then have so stated. The circumstances of the patent prosecution indicate that the patent application could have been filed considerably earlier if Tabordon had thought an earlier date was critical and had, as is likely that he would have in those circumstances, so represented to patent counsel. He expressed an interest in filing before March 1, 1962, which could have been done if he had indicated that as the critical date. Presumably he would have so indicated if that had been his understanding.

Tabordon's patent counsel, Stanley Binish, did not prosecute an application because he was too busy. The preparation of an application became the responsibility of Wheeler, a patent attorney, after a demonstration of the Tabordon full-power demonstration to the Hennessys in the summer of 1961 and the acquisition of Coats in January 1962. Wheeler had almost completed the application by February 23, 1962, when the work was transferred to James Wood, the patent attorney who completed and filed the application. Again, if there has been any sense of urgency, and James Hennessy recalled none, the application could have been completed by Wheeler and filed before March 1, 1962. Wood's recollection of his inquiries to Tabordon and

Binish respecting critical dates is uncertain and very possibly erroneous—those inquiries were over twenty years before his testimony. We do have, however, his notes indicating a first sale on March 24, 1961 and Binish's notes indicating March 15, 1961 as the critical date.

True it is that Ruby Lowell, the Coats' patent attorney, was concerned about a statutory bar, and the agreement between Tabordon and Hennessy/Coats conditions a payment upon a patent application prior to the critical date, but those circumstances more likely reflect a lawyer's caution rather than any real concern that the critical date had passed. Those prosecuting the patent relied upon the inventor for information, as is surely customary, and nothing he told them created a duty to engage in the searching inquiry and investigation undertaken by FMC/Vulcan twenty years later. In all probability some at Hennessy and at Coats saw the advertisements of the EZ tire changer in January and March 1961, but that device was then but another product on the market by a small company with no market share. There was no reason why that advertisement would be recalled at a demonstration almost six months later or during the prosecution of a patent application a year later.

Finally, FMC/Vulcan contends that Woods was on notice of a statutory bar during patent interference proceedings in 1965. But that proceeding involved a different issue and Wood's concern was establishing the earliest possible date of conception, a matter only tangentially related to the actual marketing of an operable tire changer. Those circumstances did not mandate a searching investigation. Woods continued to rely upon Tabordon for information respecting the matter which was in issue, and that information did not contradict the information previously received respecting the critical date, even though it provided a possible conception date a few weeks earlier than the January 1961 sketch Tabordon sent to himself by registered mail. While a more extended inquiry of Tabordon both in 1962 and 1965 as to how

the tire changer came to be developed and how it was demonstrated and sold would have been both appropriate and desirable, given the inventor's limited knowledge of the content of a statutory bar, this court concludes that FMC/Vulcan has not proved fraud in the Patent Office respecting the Tabordon patent by clear and convincing evidence. It is not, therefore, unenforceable on that ground.

FMC/Vulcan goes on to contend that subsequent conduct with respect to Foster patent 3,212,552 also results in both the Tabordon patent and the Strang patent, 3,255,890, being unenforceable. It further urges that conduct and further conduct respecting eleven foreign counterparts of the patents in suit, as compelling evidence of a pattern of intentional fraud in dealing with the Patent Office. Hennessy/Coats has not complained of infringement of the Foster patent or, in this action, any foreign patent. FMC/Vulcan's unenforceability argument rests upon the legal premise that inequitable conduct in procuring any of several related and co-pending patents will cause all of them to be unenforceable. The Tabordon, Foster and Strang patent applications were all co-pending, the Foster patent was procured by inequitable conduct in the Patent Office and, therefore, all three patents are unenforceable.

The primary difficulty with the argument is the premise. Perhaps, at this point, a brief return to commercial history would be helpful. The Tabordon full-power was produced by Hennessy/Coats in commercial form as its Model 990. The Model 990 used a cable/pulley system, like Tabordon's full-power, and it therefore encountered similar reliability or serviceability problems. The Model 990 modified the Tabordon design, however, in large measure by substituting a single lever for three levers in the Tabordon full-power. It was the result of an express directive to prepare the Tabordon device for sustained commercial operation and it was a significant commercial success. Despite the time gap between the Tabordon patent application and the later Foster application, the prosecutions overlapped in the Patent Office because Tabor-

don was slowed due to the interference proceeding.

The parties introduced considerable evidence on the issues of whether Foster claims 1 and 2 are anticipated by Tabordon because they read directly on the Tabordon patent disclosure (claim 2 being read broadly) or, if they do not, whether Foster is nevertheless obvious in light of Tabordon. Hennessy/Coats has not, however, as earlier stated, charged FMC/Vulcan with infringement of Foster and, therefore, the validity of that patent (which has expired) is not before this court. Rather, the issues relate solely to the enforceability of the Tabordon and Strang patents. The questions, therefore, are whether there was a duty to disclose the Tabordon application to the Foster examiner, whether the disclosure made satisfied any duty there may have been, and whether a breach of that duty causes the Tabordon and Strang patents to be unenforceable.

Regardless of whose views may be accepted respecting anticipation and obviousness, it is impossible to conclude that Tabordon was not material. It was important to a reasonable examiner in reaching his decision. The expert witnesses agreed that Tabordon was the most pertinent prior art, and this court is persuaded that it was material. Hennessy/Coats was aware of Tabordon: it was prosecuting both applications. The Foster specification discloses that prior art includes tire changers with air as the single power source to operate both spindle and bead breakers, but with a plurality of levers and linkages. Hennessy/Coats contends that this disclosure is adequate, as the primary patentable contribution of Foster is the single lever to replace the plurality of levers and that the description is of Tabordon as the prior art. Moreover, it contends, the patent examiner must have been aware of the Tabordon application because an interference search was conducted in a class which included that application. Perhaps those contentions might be more persuasive if the examiner had thereafter cited the Tabordon application as prior art, although such in-

complete disclosures have been condemned. *See CMI Corp. v. Barber-Greene Co.*, 683 F.2d 1061, 1065 (7th Cir.1982). When the patent issued, however, with no reference to any prior art, it strains credibility to believe that Hennessy/Coats was unaware that the examiner did not know of and had not considered the Tabordon application.

■ That does not, however, end the matter. Since Hennessy/Coats has not asserted Foster against FMC/Vulcan, FMC/Vulcan cannot use Foster to invoke an unclean hands defense to the entire judicial proceeding. *See Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *East Chicago Machine Took Corp. v. Stone Container Corp.*, 181 U.S.P.Q. 744 (N.D. Ill.1974). Nor do the claims of Tabordon and Strang gain any vitality from Foster. Essentially what FMC/Vulcan is doing by attacking the prosecution of Foster is to enlarge the all too familiar concept of fraud in the PTO. It seeks to deny patent protection to an assignee on any valid patent issued upon a co-pending or subsequent related application when the assignee was guilty of inequitable conduct in obtaining a patent not at issue in the litigation.

The Foster patent cannot be used as a basis for denying enforcement of Tabordon and Strang. It perhaps lends some weight to the contention that Hennessy/Coats was less than candid in its dealings with the Patent Office. Even so, such evidence must be viewed with considerable caution. As the Federal Rules of Evidence make clear, evidence of conduct on one occasion can serve as a basis for explaining conduct on another occasion only in limited situations, Rule 404(b), unless it can be established as a routine practice, Rule 406. Even less compelling is the evidence respecting foreign patent applications. The testimony there opened up but did not thoroughly explore a wholly collateral matter and, indeed, its thorough exploration would have been unwarranted given its collateral nature. The court is left with an impression that certain foreign applications should not have been pursued, but is not clearly convinced that their pursuit was demonstrably inequitable conduct.

The second patent actually in issue is Strang 3,255,800. In light of the serviceability problems with its Model 990 Hennessy/Coats redesigned its commercial model, which became the Model 10–10. That model is the embodiment of what is claimed in the Strang patent. The objects of the claimed invention are, *inter alia*, to provide a new and improved tire changing stand which can accept rims of various diameters, and which has bead breakers having the same relation to all wheel rims. Before turning to the claimed inventions of the Strang patent, however, some perspective on the relationship between Vulcan and Hennessy/Coats and Vulcan's development of a tire changer may be helpful.

Vulcan was the exclusive Canadian distributor for Hennessy/Coats from 1964 to April 1977. Vulcan's president, Bernard Alm, had a continuing friendship with Jack Hennessy, one of the Hennessy brothers. The relationship between Jack and at least some of the other members of his family was strained, and Alm's relationship with James Hennessy, another brother, was far less than cordial. Further, there were economic views supporting, in the middle seventies, a change by Hennessy/Coats to a different mode of distribution. Vulcan, concerned that it might be foreclosed from marketing Hennessy/Coats tire changers, began to consider alternatives. The alternative pursued was the development of its own tire changer with the assistance of the Ontario Research Foundation. Vulcan was well aware of the market success of the successive Hennessy/Coats models; it was well aware of the outstanding Tabordon, Foster and Strang patents and the Wood design patent 243,551; it could anticipate that Hennessy/Coats would aggressively seek to vindicate its patent rights if given any basis for asserting such rights; and it intentionally set about to design around those patents while retaining so far as possible the features which had led to market acceptance of the Hennessy/Coats tire changers. That effort resulted in the Vul-

can Auto-Mag, which was first introduced at a January 1978 trade show. The primary means for designing around Tabordon was the use of two pneumatic cylinders, and much trial time was devoted to a dispute over whether those cylinders constituted a single or dualpower source. In view of this court's other determinations respecting the Tabordon patent it seems unnecessary to reach a conclusion on that dispute. It is, however, necessary to discuss the far narrower claims relating to the Strang patent and the Wood design patent.

Hennessy/Coats claims that claims 1, 2, 3, 5 and 6 of the Strang '800 patent are infringed by FMC/Vulcan tire changers. FMC/Vulcan asserts invalidity, non-infringement and unenforceability. We turn first to the scope of the claims asserted. The primary dispute centers on claim 5.

Hennessy/Coats contends the proliferation of wheel and tire sizes created a need for more precise placing of the bead breaker shoes in relation to the rim without adjustments. Further, tire changers need to be relatively sturdy and simple devices, as they are operated by relatively unskilled persons of differing experience and care and they are subjected to tremendous forces. The lower shoe, according to Hennessy/Coats, suffered great wear and deformation when it was guided into position by a rubbing, sliding or rolling contact means. Strang solved those problems through use of a long pivoting lever which moved the lower shoe through an arc conforming to an arcuate table surface (claims 1, 2, 3 and 6) in a constant spaced relation to the table surface (claims 1, 2, 3, 5 and 6), that movement being without contact between the shoe and the tire surface.

The accused devices do not have arcuate table surfaces. Their table surfaces are flat, or slightly concave due to manufacturing procedures. Except when outsize wheels are being demounted and mounted, and except for the earliest versions of the Vulcan Auto-Mag the Vulcan and FMC lower bead breakers ride on the surface. For the occasional larger wheel, mounting and demounting means are provided (which have changed over time) variously described as shims, studs, screws, pins or buttons. When they are used, and the testimony was that they are seldom used in practice, the shoe does not ride on the surface.

Dr. Sam Clark, an expert for Hennessy/Coats, conceded that a constant spaced relation did mean a space between the bead breaker and the surface, which the accused devices do not have except with outsize wheels and the earliest model. He contended, however, that the constant could be one of a considerable variation and that, therefore, the variation in distance from a chord, the flat surface, was so inconsiderable that a flat surface was the functional equivalent of an arcuate surface. Further, claim 5 is not restricted to an arcuate surface and, therefore, the movement across the flat surfaces when outsize wheels are demounted or mounted infringes the constant spaced relation protected by claim 5.

Those contentions suffer from several infirmities, not the least of which is that this overly expansive view of the Strang claims, if true, provides considerable support to FMC/Vulcan's contention that the Strang patent is unenforceable due to fraud in the Patent Office arising from a failure to cite the earlier 990 model which gave rise to the Foster patent. The 990 lower bead breaker rode on the surface through a cam and cam follower, and the table surface was slightly concave rather than convex. The spacing was, however, akin to that in the accused devices. If, as Dr. Clark urged, the constant relation in Strang was what was inventive, but that "constant" permitted considerable variation because tire changers are not high precision equipment, then Foster becomes material, as it too provided reasonably constant spacing. True, Foster did not disclose a constant *spaced* relationship, and therefore there were, as Joseph Bloodsworth of Hennessy/Coats testified, problems with cams and cam followers guiding the lower shoe and needing constant adjustment because of the considerable stresses during actual

operation. But then, again, neither do most of the accused devices have a spaced relationship except when demounting and mounting outsize wheels.

That constant spaced relationship was accomplished in Strang claims 1, 2, 3 and 6 by movement across an arcuate surface, which the accused devices do not use. While the means for accomplishing that result are claimed more broadly in claim 5, it is not accomplished in most of the accused devices except when handling outsize wheels—and only then when various adjustments are made to accomplish that result. Otherwise, most of the accused devices, like Foster, have constant contact between the tire and the lower shoe during the initiation of the operation.

■ Does the use of shims and the like infringe the Strang patent, assuming Strang is valid? This court concludes that it does not. A primary purpose of Strang was to provide a means to position the lower shoe without subjecting the tire changer to the stresses caused by contact, and without adjustment. We conclude that the "infringement" during the demounting or mounting of outsize wheels, if there be such, was not an infringement within the scope of claim 5 as it was not within the scope of the invention claimed even if it was within the literal language of claim 5. *Elgen Manufacturing Corp. v. Ventfabrics, Inc.*, 314 F.2d 440, 443 (7th Cir.1963).

The impact of the Hennessy/Coats argument upon the materiality of Foster has already been noted. That suffers from another infirmity as well. The term "constant" may well mean somewhat different things in different contexts. We are here discussing devices which do not require precision tolerances and some variation may still be "constant" as that term is understood in the industry. The degree of variation urged by Hennessy/Coats here as still within the ambit of "constant" raises, however, serious questions of claims indefiniteness. Finally, it appears that users of the accused devices seldom use the shims and the like which Vulcan and FMC have provided; as a practical matter they don't

bother to make any adjustments and, instead, wrestle a little with the tire changer to make it work on outsize wheels in the usual operating mode. While that may be more germane to damages than to infringement, it does, perhaps, illustrate the highly contentious nature of this lawsuit in which no possible issue has remained undeveloped. In any event, this court concludes that FMC/Vulcan successfully designed around the Strang patent and that the accused devices do not infringe Strang patent claims 1, 2, 3, 5 or 6.

That takes us back to one further concern. As I understand the evidence, the early version of the Vulcan Auto-Mag did use a spaced relationship; it comes closest to infringing Strang, assuming that patent is valid. That relationship was constant, however, only in the sense that the variation in spacing was not considerable, as the device did not have an arcuate surface. If "constant" means what Hennessy/Coats contends, then the FMC/Vulcan contentions respecting the materiality of Foster and claim indefiniteness must be accorded considerable weight. Conceptually, claim 5 by its literal language perhaps goes beyond an arcuate surface and reaches other constant spaced relationships, although even claim 5 describes the guide means arm for the shoe as having a pivot at tabletop radius. We do not believe, however, that it can fairly be read upon a device in which the guide means followed a path different from the plane of the table.

As is evident from what has already been discussed, we do not find by clear and convincing evidence that there has been inequitable conduct in the Patent Office with respect to the Strang patent. If, as we have determined, the Strang disclosures relate to a tire changer with constant spaced relationships permitting the demounting and mounting of wheels without adjustment, then Foster is not material.

We turn, finally, to the claim of infringement of Wood design patent No. 243,551, which is set forth at the end of this opinion.

■ The general legal standards for determining the validity and infringement of a design patent are not seriously in dispute and are of long standing. The various statutory and judicial presumptions are no different for design patents than they are for mechanical patents. The statute is concerned with the appearance of the design, the appeal to the eye of the average or ordinary purchaser. The protection is for decorative design for an article of manufacture; the design cannot be dictated by utility. The design must be new, original and ornamental and the result of invention. Infringement of a valid design patent is to be judged by synthetic observation rather than by analytic inspection—the overall appearance as viewed by the observer.

Those standards are however far from being self-executing, and this court admits to a high level of discomfort in attempting to apply those concepts to this case. The judgment required is highly subjective, an aesthetic determination of the degree of statutory protection which should be accorded to ornamentation when viewed from the perspective of an ordinary purchaser.

■ FMC/Vulcan contends that the Wood patent is invalid because the design is both obvious and wholly functional. It further contends that the accused devices do not infringe and that, in any event, the design patent is unenforceable because of fraud in the Patent Office. This court is not persuaded, on the basis of clear and convincing evidence, that the patent is invalid nor that it is unenforceable. This court does believe, however, that the accused devices do not infringe.

When the Wood patent issued in 1977 the concept of a skin to enclose most or all of the mechanism of a tire changer was familiar. The Simkins design patent, No. 213,914, cited by the patent examiner, disclosed such a skin. Further, both the prior art Magnum Model 001 tire changer and the Hennessy/Coats predecessor Model 20.20A tire changer disclosed unitary enclosures, although the Model 20.20A did not include the surge tank within the enclosure. There can be little argument, however, that the Wood design was new and original, and FMC/Vulcan does not contend otherwise. It argues, however, that the Wood design is not ornamental, is obvious to a person of ordinary skill in the art (and the parties do not disagree that such a person is a designer in the tire changer art who was a technician or a mechanical engineer doing both mechanical design and exterior appearance design) and, finally, that the design primarily serves a functional or utilitarian purpose.

Hennessy/Coats' expert testimony was somewhat akin to an advertising blurb. It contends that the basic overall patented design is monolithic and portrays a lowboy credenza look, which provides an impression of ruggedness and compactness. It has a long horizontal accent. This court is persuaded that the design is pleasing and ornamental. We also recognize that the lowboy shape is dictated by the dimensions of the mechanics of the tire changer enclosed and that there is a functional necessity for strengthening the sheet metal panels through ribs or flutes, an obvious way of providing rigidity. The number, configuration, spacing and location of members to provide that rigidity are, however, to some extent, a designer's aesthetic decision. The question is whether the design is obvious, and this court, relying heavily upon the presumption of validity, cannot say that it is.

FMC/Vulcan suggests that the mortality rate in court respecting design patents is considerably higher than the mortality rate respecting mechanical patents, and this may well be so. There may well be a disposition to look upon a particular box, as here, as something that anyone with some common sense and design ability could create, particularly given the somewhat limited options resulting from the functional necessities imposed by the mechanics of the unit enclosed. This court is, however, mindful of the fact that an experienced primary examiner in the Patent Office has made a judgment of novelty, that Congress has entrusted the primary responsibility for making that judgment to the Patent

Office, and that this court should not be substituting its judgment on such a subjective matter without more compelling reasons than are advanced here.

FMC/Vulcan insists that the patent is unenforceable because Hennessy/Coats failed to disclose material prior art to the examiner. True it is that the examiner cited neither the Magnum 001 nor Model 20.20A. FMC/Vulcan insists that the examiner must have known of those designs because the same examiner had cited, in his examination of a tire changer design issued more than a year before the Wood application, a page from the 1973 "Modern Tire Dealer" catalog which showed both the Magnum 001 and the Model 20.20A. The duty of candor requires more, however, than an assumption that the examiner will recall something from a previous examination. Here, though, the examination history reveals more. The file wrapper affirmatively establishes that the examiner searched in two areas, the PTO file of Class D54, Subclass 13R, which contained the same page cited in the earlier patent, and "Modern Tire Dealer, 1974, 1975," which contained numerous depictions of the Magnum 001 and Model 20.20. When the examiner represents that he has reviewed specific prior art the duty of candor does not require the applicant to advocate that the examiner should have cited that art as material when he fails to do so. The Wood design patent is not unenforceable.

That brings us to the issue of infringement. Hennessy/Coats makes much of FMC/Vulcan's interest in a tire changer similar in appearance to the patented design, and clearly FMC/Vulcan was concerned that its units convey the same overall sense of ruggedness and compactness as the dominant tire changers in the marketplace. Did FMC/Vulcan, in seeking to accomplish that objective, sufficiently design around the Wood design patent? This court is persuaded that it did and that Hennessy/Coats has not sustained its burden of proving infringement.

A determination of the infringement issue is somewhat of an existential exercise. It is not enough to say that no one would confuse the two designs because one is red and the other is green and both have prominently displayed logos. The test is not palming off; color and designations are not part of the patented design and must be ignored. On the other hand, it is not enough to say that to the casual observer the two devices look rather similar. In the first place, the hypothetical observer is neither a casual passerby nor an expert, but rather is an ordinary purchaser. *Gorham v. White*, 81 U.S. (14 Wall) 511, 20 L.Ed. 731 (1871). Further, what that ordinary purchaser is observing is a design in which detail dictated solely by function is ignored and in which similarity to the accused design arises from the novelty which distinguishes the patented device from the prior art. *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444 (Fed.Cir.1984). That hypothetical observer, therefore, ignores color, designation and design aspects solely dictated by function and, viewing the design from the perspective of its novelty, determines whether the accused design is substantially the same so that he might purchase it supposing it to be the patented design. There is, thus, a consideration of deception in the standard, although not in the same sense as palming off.

FMC/Vulcan's expert, Walter Teague, followed that procedure, and this court largely credited his testimony and his conclusions, although it disagrees to some extent with his rather broad concept of what is solely functional. The general size and configuration of the box, the tabletop which receives the wheel, some means to strengthen the front and rear panels, and some wells or trays on top to hold nuts, bolts, tools and the like, are all functional. The inflator ring design is largely functional. The tabletop and an all-inclusive skin are part of the prior art. The point of novelty is a design which includes the configuration of the top, the arrangement of gauge and trays, the configuration of bracing at the top of and each end of the front and back, and the configuration of the ribs to strengthen the removable front and back panels.

In the design patent the top is of three levels or plateaus, the gauge is recessed,

and there are four trays. The top bracing is relatively narrow where the gauge recess is located and at the lower plateaus. The panel ribs are narrow, the recesses wide. The accused design has a flat top; the gauge projects above the top; there is one large tray on the left and, as I recall, one small well to the right; the top bracing is wider and heavier; the ribs are considerably wider and the recesses considerably narrower. The ordinary purchaser is a person purchasing a relatively expensive piece of equipment which will be depended upon for extended rough use. Even if we ignore the appearance of the operating tire changer (the FMC/Vulcan has a different configuration for the upper bead breaker and a different location for the lube container, neither element being included in the patented design), the accused design is not one which would appear substantially similar to the patented design as observed by an ordinary purchaser. Indeed, the Hennessy/Coats expert intimated as much. Plaintiff has not proved infringement.

### CONCLUSION

For the reasons stated, this court concludes that Tabordon '801 is invalid, although not otherwise unenforceable; that Strang '800, if valid, is enforceable but not infringed; and that the Wood design patent is valid, and enforceable but not infringed.